**HOLLYWOOD ACCESSORIES, DIVI-SION OF ALLEN ELECTRON-ICS & EQUIP. CO.**

**v.**

**UNITED STATES.**

**C. D. 3391; Protest No. 67/6979–88666.**

United States Customs Court,
Second Division.
April 3, 1968.

Stein & Shostak, Los Angeles, Cal. (Leonard M. Fertman, Los Angeles, Cal., of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Brian S. Goldstein, New York City, trial attorney), for defendant.

Before RAO, FORD and BECK-WORTH, Judges.

BECKWORTH, Judge:

The merchandise involved in this case, described on the invoices as pouring spouts, was imported from Japan and entered at the port of Los Angeles-Long Beach during August and September 1965. It was assessed with duty at 19 per centum ad valorem under item 657.20 of the Tariff Schedules of the United States as articles of iron or steel, not coated or plated with precious metal. It is claimed to be properly dutiable at 17 per centum ad valorem under item 651.47 of said tariff schedules, as hand tools of iron or steel.

The pertinent provisions of said tariff schedules are as follows:

Articles of iron or steel, not coated or plated with precious .metal:

Cast-iron articles, not alloyed:

 *   *   *   *   *   *

Other articles:

 *   *   *   *   *   *

657.20   Other . . . 19% ad val.

Hand tools (including table, kitchen, and household implements of the char-

acter of hand tools) not specially provided for, and metal parts thereof:

* * * * * *

Other hand tools:

Agricultural or horticultural tools, and parts thereof:

Other:

Of iron or steel:

Cast-iron hatters' irons, and tailors' irons

651.47    Other . . .    17% ad val.

At the trial, plaintiff called Philip Colburn, vice president and general manager of Hollywood Accessories, a Division of Allen Electronics & Equipment Company, the plaintiff herein. Mr. Colburn testified that his firm handles automotive accessories, tools, and custom speed equipment and that his duties include sales, purchases, and administration. He was familiar with the merchandise involved herein and stated that a sample, received in evidence as plaintiff's exhibit 1, was representative of one of the imported items designated on the invoice as CO-18. Other articles, designated as CO-14 and CO-15 were similar to exhibit 1 except for size and slight differences in shape. They were used in the same manner and were similar in design.

Exhibit 1 is a curved metal tube about 10 inches long, having a diameter of about an inch at its widest part and tapering to about three-eighths of an inch at one end. At the other end, the tube is open and flattens out into the shape of a shovel or spade to a width of 1¾ inches. A pointed cutting implement has been inserted and securely fastened to the tube by means of a nut and screw. It lies along the shovel or spade-shaped portion of the tube.

Mr. Colburn testified that the purpose of exhibit 1 was to open an oilcan and to provide a means of pouring the fluid from the can into another container or into an engine block. He said:

* * * The user will grasp the spout-end of the tool to punch into the oil can, normally, and the tool will then seal the opening in the can.

MR. GOLDSTEIN: Objection, your Honor, to the terminology "tool." That is one of the issues before the court. It is conclusory.

JUDGE FORD: That is the witness' opinion.

THE WITNESS: Well, the pouring spout will be pierced into the can, and the fluid will flow out of the spout directed by the opening at the other end.

Mr. Colburn stated that he had been importing articles similar to exhibit 1 for approximately 6 years and that he had used them himself in the manner stated and had seen them so used. He had never seen them used without being attached to a can or being used to puncture the can from which the liquid was poured. He could see no reason why they would be used just to puncture or just to pour. He would not say that pouring was their principal function.

The witness was in substantial agreement with the following definition of "tool" from Webster's Third International Dictionary:

An instrument used or worked by hand, or an implement or object used in performing an operation, or carrying on work of any kind, or an instrument by which something is effected or accomplished.

The witness considered plaintiff's exhibit 1 to fall within that definition.

Mr. Colburn stated that he generally categorized and sold the article as a hand tool, but that when it was ordered from his firm, it was ordered as a pour spout and by stock number. His firm sells automotive tools, brake spring pliers, brake spoons, crimping tools, oil filter wrenches, and tools generally used in and around a car. He considered the articles involved here to be tools similar in use to the above.

The witness said his firm sold approximately 350,000 to 400,000 of the articles per year. Among his firm's customers are large discount stores, automobile accessory stores, and automobile

accessory dealers, such as Western Auto Supply and Gamble Skogmo Incorporated. In the case of Western Auto, this article is purchased by the hand tool buyer and in the case of Gamble Skogmo by the auto accessory buyer.

The witness had traveled to all parts of the country and had attended trade shows. He had seen this merchandise displayed in stores near oil, where oil is sold at the store. When oil is not sold at the store, it will generally be in the tool section. It is very commonly displayed on imported tool tables, the 88-cent section. It is generally described as a pouring spout.

Plaintiff's second witness was Joseph Patrick Stafford, vice president and general manager of Light Sales Company and G L Company, tool importers and distributors. He had been with those firms for 5 years and had previously been purchasing agent for Thorn Cordage Company and Hardware Distributors for 13 years. He was familiar with plaintiff's exhibit 1 and stated that it was an oilcan spout similar to merchandise which his firms handle in quantities of tens of thousands of dozens every year. As a sales representative in the hardware industry and in his capacity with G L Company and Light Sales Company, he had sold this item in Hawaii, California, and Arizona. His companies sell to discount stores, hardware stores, and surplus stores, and offer exhibit 1 as an oilcan spout. He has seen it displayed in the automotive or hardware department of discount stores and hardware stores.

The witness stated that exhibit 1 was a tool, functioned as a tool, and was operated by hand. He based his opinion on his definition of a tool, that is, a device designed to assist in the accomplishment of a task. He said that it punctures a can, seals it, and directs the flow of oil. He considered puncturing the major function of the article, as without the puncture there would be no use for the spout. While a can could be opened with another tool of some sort and then exhibit 1 used to pour liquid from one container to another, he said that would be pointless. While the cutting part of exhibit 1 is removable and the article could be used just for pouring liquid, that would not be using it to perform the function for which it was designed. The witness had never seen exhibit 1 used either just to pour or just to puncture. In fact, he did not consider it an article with a dual function. He said it accomplishes one purpose, to puncture the can and pour the liquid into the automobile. He considered the puncturing and pouring to be one purpose.

Mr. Stafford agreed with the definition of a tool from Webster's Third International Dictionary, supra, and said that he considered exhibit 1 to fall within that definition.

The issue before the court is whether these articles are hand tools within the meaning of schedule 6, part 3, subpart E of the Tariff Schedules of the United States. Plaintiff claims that they are, on the ground that they are implements or objects which perform an operation, carry on work, serve as a means to an end, and effect a result as follows:

1. They puncture a hole in the can which is to be drained of its liquid contents;

2. The perimeter of the hole is sealed so that no liquid escapes other than through the spout; and

3. The liquid is poured from the can through the spout into the motor or receptacle.

Defendant points out, on the other hand, that the articles are bought, sold, and known in the United States as pouring spouts or oilcan spouts and claims that pouring is their primary function. It quotes definitions of the term "spout", including the following:

Webster's Third New International Dictionary, 1963:

> * * * a tube, pipe, or conductor through which a liquid is discharged or by which it is conveyed in a stream from one place to another: as * * *

c(1): A projecting tube or lip for guiding the flow of a liquid poured from a receptacle. * * *

Funk & Wagnalls New Standard Dictionary, 1966:

1. A tube, trough, nozzle, or chute for the discharge of a liquid or semi-liquid, or of small solids, as grain, etc., usually from a receptacle or a machine; a pipe or conduit; as the *spout* of a tea pot. * * *

The article here is obviously more than a spout since it not only serves as a pipe or tube to conduct liquid from one place to another, but punctures the can, seals it, and remains attached to it while the liquid is being poured from it. It is defendant's contention, nevertheless, that the principal function of the implement is to convey liquid from one place to another and that the cutting feature is incidental. The testimony, the sample, and common knowledge do not support that view.

An examination of the sample discloses that the spout portion has been carefully formed to serve as a handle for the blade.

The shape of more than 50 percent of its entire length bears some resemblance to the shape of the handle of a horse-drawn plow. On the top of the spout, there are four recesses about three-fourths of an inch apart that, when gripped either by the fingers or the palm of the hand, help to prevent the hand from slipping. On the bottom of the spout, there are finger-size indentations into which three or four fingers of the hand fit comfortably in order to assure a firm grip. If the spout were solid instead of hollow, its function as a handle would in no wise be affected. As a matter of fact, the spout part of exhibit 1 would then perform only the function of a handle. Also, it is clear from an examination of the blade part that it would be totally impracticable to use the blade without the handle.

The first operation for which the article is used is to open the can. In doing so the operator grasps it by the spout portion or handle. The can is punctured and sealed, with the implement firmly attached to the can. The cutting blade, which is rounded, fits into the can and helps to guide the liquid into and through the tube. Normally, the operator immediately inserts the spout end into the motor or receptacle into which the oil is to be poured. Obviously, nothing could be poured from the can if it had not been punctured first. Mr. Stafford testified that the puncturing was the primary function of the article since without the puncture there would be no use for the spout for there would be nothing to pour.

An examination of the sample indicates further that it could not be used for pouring except when attached to a can in the manner designed. Because of the shape of the head of the spout, which is like a spade or shovel rather than a funnel, it would be difficult, if not impossible, to pour liquid through the spout without spilling any. Obviously, that would be unfeasible, and, according to both witnesses, was never done. On the other hand, the cutting portion, with the spout as the handle, could be used without difficulty to punch a hole in a can, whether or not the spout were used thereafter for pouring, and whether or not the spout portion were solid.

The witnesses regarded the implement as a hand tool which served one overall purpose—"to puncture an oil can in order to remove the contents, and to put it into an automobile or into another container." It is not a combination joining two co-equal articles, each of which performs an independent and wholly different function, such as the pencil and cigarette lighter in United States v. Sydney Kann & Co., 20 CCPA 77, T.D. 45702, or the brush-shoehorn in E. M. Stevens Corp. v. United States, 56 Cust.Ct. 494, C.D. 2687, appeal dismissed 53 CCPA 155. Here the functions are closely related and complementary; the use of the article for pouring is dependent upon its first being used to puncture and seal a can to which it remains attached during pouring.

In Astra Trading Corp. v. United States, 56 Cust.Ct. 555, C.D. 2703, the merchandise, invoiced as a "Flashlight Tool", consisted of a screwdriver with an illuminating feature. The flashlight component had been assessed under the provision for flashlights under paragraph 353, Tariff Act of 1930, as modified, and the screwdriver components under paragraph 396. The court found that the separate components did not have any useful purpose separate and apart from the functions they served when combined with each other and that the entirety was a screwdriver. The court stated:

> * * * We do not believe that the additional feature of illumination transforms the basic purpose of the imported article from use as a screwdriver into some other use; nor do we believe that the illuminating feature gives the article a use in addition to its intended use as a screwdriver. For, illumination notwithstanding, the article remains essentially a device restricted to the use of turning screws, i. e., a screwdriver. * * *
>
> * * * * * *
>
> * * * we find that the record fails to show that the imported article, specifically designed and intended to be used as an illuminated screwdriver, notwithstanding the existence of the additional feature of illumination, serves any end purpose other than that of a screwdriver. It is, in short, a device for turning screws, and should, therefore, be classified as a screwdriver under paragraph 396 of the Tariff Act of 1930, as modified.

In V. Alexander & Company, Inc. v. United States, 59 Cust.Ct., C.D. 3212, the court held that a combination pick-shovel could not be treated for tariff purposes as a separate shovel and a separate pick. In the course of the opinion the court said:

> * * * An article will be excluded from its normal provision when, by virtue of joinder with another article,

it becomes an inseparable part of a multifunction entity. That is to say, when the change undergone is no longer merely an evolutionary advance or the *addition of a subsidiary auxiliary part*, the changed article becomes more than that which it formerly was. * * * [Emphasis supplied.]

The headnote to subpart E of part 3 of schedule 6 of the tariff schedules states that, with certain exceptions not here pertinent:

> This subpart covers only articles with a blade, working edge, working surface or other working part of—
>
> (i) base metal;
>
> * * * * * *

The article here does have a blade or working edge of base metal, thus meeting the first qualification for classification under the subpart to which item 651.47 belongs. Defendant claims, however, that it is not a hand tool, citing P. H. De Wilde and Harper, Robinson & Co. v. United States, 35 Cust.Ct. 295, Abstract 59420. That case involved certain vises, weighing 14 to 143 pounds, each of which was bolted down to a milling table or a drill press. They were classified by the collector under paragraph 396 of the Tariff Act of 1930, which included vises "if hand tools not provided for in paragraph 352." The court noted that the Encyclopaedia Britannica drew a distinction between hand and machine tools and stated that the former included any tool which was held and operated by the unaided hands. The court held that, since the vises could not be held and operated by the unaided hands, they were not hand tools, but were properly dutiable as machines.

Since the articles here are used by the unaided hands we do not find that this case is in point. It seems clear that, if the instant merchandise is a tool, it is a hand tool.

Both of the witnesses said the article was a tool and that it fell within the definition from Webster's Third Interna-

tional Dictionary, supra, which was read at the trial. Other definitions are:

Webster's New International Dictionary, 1953 ed:

An instrument of manual operation, as a hammer, saw, plane, file, or the like, used to facilitate mechanical operations as distinguished from an appliance moved and regulated by machinery; the instrument of a handicraftsman or laborer at his work; an implement; as, the *tools* of a joiner, smith, shoemaker, etc.

Funk and Wagnalls New Standard Dictionary, 1956 ed:

1. A simple mechanism or implement, as a hammer, chisel, plane, spade, or file, used in working, moving, or transforming material.

The Reader's Digest Great Encyclopedic Dictionary, in discussing the terms "tool", "instrument", "implement", and "utensil", states that "anything operated by hand may properly be called a tool."

Defendant cites the explanatory notes to the Brussels Nomenclature, volume II, chapter 82, pages 738–744, for a list of tools which are considered to be hand tools. It states that those enumerated share the basic characteristics of being used independently, freely and without support in the hand, and attempts to distinguish the implement at bar on the ground that, after it has been used to puncture a can, it is no longer guided or manipulated in the hand as one would guide a wrench, plane, screwdriver, hammer, pliers, or chisel. The Brussels Nomenclature is not a complete guide to the intention of the Tariff Commission or the Congress in construing the provisions involved here, since the language of the tariff schedules is somewhat different from that of the Brussels Nomenclature. Cf. Pitney-Bowes Inc. v. United States, 59 Cust.Ct., C.D. 3116, appeal dismissed December 26, 1967, where the language was the same. We note, however, that the explanatory notes include underhand tools, oilcans and oilers, and can openers, which is some indication that implements used for puncturing cans and those used for oiling were considered to be hand tools.

In our view, the article before us is a hand tool of the type ordinarily found in garages and service stations and used for the specific purpose of opening cans and pouring their contents into an automobile or other container. Nowadays, oil and other fluids for automobiles are largely bought and sold in quart or gallon cans, which are opened by the attendants and the contents poured into the engine or receptacle. This could be done, and may once have been done, by the use of a can opener or punch along with a funnel. The fact that it is presently done in one continuous operation by using a single implement does not make that implement any the less a tool by which the work is accomplished. Probably, no other tool is now found in garages or service stations which could do this work. The blade clearly serves a tool function and a handle is required for its use. Here the handle is hollow and performs the additional function of a pouring spout. The single implement aids in performing the work required—getting the liquid from the can into the engine or receptacle. It is, therefore, a hand tool, as that term is commonly understood.

We hold, therefore, that the pouring spouts involved herein are properly dutiable at 17 per centum ad valorem under item 651.47 of the Tariff Schedules of the United States as hand tools of iron or steel, other. The protest is sustained and judgment will be entered for the plaintiff.