(C.D. 4086)

F. B. Vandegrift & Co., Inc. *v.* United States

United States Customs Court, First Division

(Decided October 9, 1970)

*Allerton deC. Tompkins* for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Robert Richardson* and *Velta A. Melnbrencis*, trial attorneys), for the defendant.

Before Watson, Maletz, and Rosenstein, Judges

Rosenstein, Judge: This case involves the classification of straightening combs imported from West Germany in August 1965

which were classified under TSUS item 750.15 as combs and assessed with duty at the rate of 0.8 cent each plus 16 per centum ad valorem. Plaintiff contends that the articles are not "combs" as defined in the tariff schedules and that they are properly classifiable as brass household hand tools under TSUS item 651.49 [1] and dutiable thereunder at 10 per centum ad valorem, or, alternatively, as brass household articles, not specially provided for, under TSUS item 654.00 which also carries a duty rate of 10 per centum ad valorem.

For the reasons discussed *infra*, we sustain the claim under item 651.49.

The pertinent provisions of the tariff schedules read as follows:

Schedule 7, Part 8:

\*　　\*　　\*　　\*　　\*　　\*　　\*

Subpart A.—Combs, Hair Ornaments, Brooms and Brushes, Paint Rollers

\*　　\*　　\*　　\*　　\*　　\*　　\*

2. For the purposes of this subpart, the term "*combs*" means toothed instruments having not over two rows of teeth, for adjusting, cleaning, or confining hair, or for personal adornment.

Combs:

\*　　\*　　\*　　\*　　\*　　\*　　\*

Valued over $4.50 per gross:

\*　　\*　　\*　　\*　　\*　　\*

750.15　Other _____ 0.8¢ each + 16% ad val.

Schedule 6, Part 3:

Subpart E.—Tools, Cutlery, Forks and Spoons

Subpart E headnotes:

1. \* \* \* this subpart covers only articles with a blade, working edge, working surface or other working part of—
(i) base metal;

\*　　\*　　\*　　\*　　\*　　\*　　\*

Hand tools (including table, kitchen, and household implements of the character of hand tools) not specially provided for, and metal parts thereof:

\*　　\*　　\*　　\*　　\*　　\*　　\*

---

[1] Although this claim was allegedly made by amendment to the protest (R. 2,31), the records do not indicate that the protest was so amended. Defendant's failure to object is construed as a waiver, and the amendment is deemed to have been made. All other claims were abandoned at the trial.

Other hand tools:

| | * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|---|
| 651.49 | Of brass | | | | | 10% ad val. | |
| | * | * | * | * | * | * | * |

Articles not specially provided for of a type used for household, table, or kitchen use; toilet and sanitary wares; all the foregoing and parts thereof, of metal:

| | * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|---|

Articles, wares, and parts, of base metal, not coated or plated with precious metal:

| | * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|---|
| 654.00 | Of brass | | | | | 10% ad val. | |

Samples of the merchandise identified on the invoice as "31 W", "O", and "31 S" straightening combs were received in evidence as exhibits 1, 2, and 3, respectively, and were stipulated to be in chief value of brass. The comb portions, which appear to be constructed from a single piece of metal, have teeth and thick rounded backs. Exhibits 1 and 3 have handles which appear to be of wood; exhibit 2 has a spiralled metal handle. All three are heavier than the ordinary comb used for combing the hair. The first two exhibits were also exhibits 1 and 2 in protest 64/4282, decided in *F. B. Vandegrift & Co., Inc.* v. *United States*, 56 Cust. Ct. 103, C.D. 2617 (1966), the record in which was incorporated herein (R. 23).

The merchandise in the incorporated case, which was imported in 1961, was classified under paragraph 397, Tariff Act of 1930, as articles wholly or in chief value of metal, not specially provided for, and claimed dutiable under paragraph 339 of said act, as household utensils in chief value of brass. Five witnesses testified at that trial: Israel Gayer, partner in the Quaker Hair Goods Co. (the ultimate consignee), who had personally designed the merchandise, formerly called on dealers, accompanied door to door salesmen, and observed the articles being used; Edward Howell III, partner and general manager of Howell Bros. Chemical Laboratory, manufacturers and distributors of items such as those involved, who used to travel all over the country selling them and had observed their use; Ida Jones, salesgirl and housewife, who sold the Quaker Hair Goods products and used them herself; Rose Lee Dickerson, housewife, who also used the involved products and had seen them used by others; and William Robinson, an independent door to door salesman of products like exhibits 1 and 2.

The trial court summarized their testimony as follows (pages 106–107):

According to these witnesses, items 1 through 5 [2] have a wide and extensive use in the homes of Negro women and girls in the United States. Exhibits 1 and 2 are used to take the kinks out of kinky hair and to make the hair stand out straight. Exhibit 2, the smaller, is used for the temples, the short hairs in the back and along the nape of the neck. Exhibits 3, 4, and 5 are then used to curl the hair.

These articles are used in the kitchen since they must be heated and that is usually done over an open flame of the gas stove. They are kept with other larger kitchen utensils and are used by all the female members of the family at intervals of from 3 to 14 days. They are used for the personal convenience and comfort of the women, to improve their appearance, give a "western" look and keep up their status, and are essential articles of utility for Negro women. Use of these articles in the home is more economical than going to beauty parlors.

These articles are sold by door to door salesmen and through drugstores and mail-order houses. They are not sold to beauty parlors and beauty supply houses. They are designed for the household trade and are not sold and are not suitable for professional use. Straightening combs and curling irons used by professionals are constructed differently, will not break the hair as easily, will heat faster, and will hold the heat longer.

The court held the involved combs were not of the same class or kind as the straightening combs used by professional beauticians in beauty shops. After a painstakingly detailed analysis of the testimony, it found that plaintiff had established that articles of the kind at bar were chiefly used in the household by the members thereof, and sustained the claim under paragraph 339 (56 Cust. Ct. 109, 111–112).

Three witnesses, including Gayer and Howell who had testified in the incorporated case, appeared for plaintiff in the pending case; one witness testified for defendant.

The straightening combs are used in the following manner: the hair is shampooed, combed with a tangle comb to remove tangles, and then blocked off in sections; oil or cream is applied to the scalp and hair; the heated straightening comb is placed in a section of hair, then turned over so that the back of the comb (the solid portion holding the teeth) is pressed against the hair. The comb is then pulled through the hair at an angle to the head. The hair is straightened or "pressed" as it is pulled across the heated back portion of the comb. At this point the hair is left in an "unattractive" condition and must be curled (with a curling iron), combed, or brushed so that it is "more presentable." The pressing may last from 3 to 14 days depending upon the weather.

---

[2] Exhibits 3, 4, and 5 are curling irons, which are not involved in the pending case.

Gayer testified that he did not sell merchandise of the kind at bar to beauticians or beauty parlors as they bought professional hair straightening combs which were made differently. The instant combs are suited for home use because they are made from solid ingot, are more reasonable in price and cannot hold up under continual use in a beauty shop. The professional comb has teeth which are made "in an individual piece", sometimes of different shapes, and are then put together; it is less likely to break the hair than the combs at bar. The use of the imported combs has not changed over the years except that some white women also use them in their homes to straighten their hair. The terms "adjusting" and "confining" are not used in the industry.

Howell testified that the subject merchandise is used primarily in the home. Although he had given up selling from door to door, he sells combs like the ones at bar at his place of business. He sells professional straightening combs, not the kind herein, to beauty parlors. Exhibits 1, 2, and 3 do not clean, confine, or adorn the hair. The term "adjustment" relates to styling of the hair. These combs do not style the hair but are primarily used for straightening.

Plaintiff's third witness, Claudia Rodriguez, co-manager and beauty operator at a Philadelphia beauty salon, testified that the subject merchandise is used in the home to straighten the hair so that it can be recurled and then styled or cut.

Defendant's witness, Lydia Nutter, a beautician at another Philadelphia beauty salon, testified that she had become familiar with the subject merchandise, which she referred to as "straightening" or "pressing" combs, as a child; that she has seen and used them in the beauty shop, homes and in schools. Exhibit 2 is "primarily about the same" as the small professional straightening combs she uses in her shop, but exhibit 1 is different from the larger combs she uses. The professional straightening combs illustrated in the Quaker Hair Goods Co. catalog (exhibit A) are similar to what she uses in her shop. Exhibits 1 and 2 and professional straightening combs are all pressing combs. She has also used exhibits 1 and 2 outside the beauty parlor to put a "very casual" curl in the hair, and has used the back of a "styling" comb in conjunction with a chemical straightener to straighten hair.

Turning to the issues herein, it should be noted that we are not dealing with, as defendant suggests, an *eo nomine* provision that includes all forms of the article (or all articles known as combs) but with one delimited by Headnote 2 of Schedule 7, Part 8, Subpart A. As it is not disputed that the articles at bar have a single row of teeth, do not clean or confine the hair, and are not used for personal adornment, the

question narrows down to whether they are used for "adjusting" the hair within the meaning of the aforesaid headnote. Although the headnote was apparently taken from the dictionary definitions generally given for the term "comb",[3] (*Miller Harness Co., Inc.* v. *United States*, 59 Cust. Ct. 1, C.D. 3053, 270 F. Supp. 823 (1967)), the phrase "adjusting the hair" is not in common use in the hairdressing industry.

The term "adjust" has been defined in the lexicons as follows:

*Funk & Wagnalls New Standard Dictionary*, 1941:

1. To cause to fit; make exact; bring into such relative positions or relations as will make action harmonious or possible; as, to *adjust* the parts of a machine. To arrange in order, systematize. * * *

*Webster's New International Dictionary*, 1953:

* * * 2. To make exact; to fit; to make correspondent or conformable; to bring into proper relations; as to *adjust* a garment to the body, * * *. 3. To put in order; to regulate, or reduce to system. * * *

To the extent that hair straightening is an essential step for the woman with tightly curled or kinky hair who wants to have the so-called western look or style, the articles herein, in the broadest sense of the term, "adjust" the hair. But it is clear that these combs do more than adjust—they *process* the hair. The pressure of the heated comb against the hair actually changes, albeit temporarily, a basic quality or characteristic of the hair by removing the curl. Thus, its effect goes far beyond that of a tangle comb, for example, which merely removes tangles, but does not alter the texture of the hair. Therefore, the term "adjusting the hair" is inadequate to describe the function of the implements at bar. Moreover, we are unable to find any evidence of legislative intent to give that phrase the overly broad, all-encompassing meaning claimed for it.[4] Accordingly, we find that the straightening combs at bar are not used for adjusting the hair within the purview

---

[3] For example, *Webster's New International Dictionary*, 1953, defines "comb" as—
1. An instrument consisting of a thin strip, as of metal, bone, wood, etc., with a row of teeth on one or both edges or sides, used for adjusting, cleaning, or confining the hair, or for adornment. * * *

[4] In the incorporated case, Judge Nichols made the following observation which, although dictum has some pertinency hereto:
* * * The dictionary definition of "comb" is as follows:
1. An instrument consisting of a thin strip, as of metal, bone, wood, etc., with a row of teeth on one or both edges or sides, used for adjusting, cleaning, or confining the hair, or for adornment. [Webster's New International Dictionary.]
*There are some respects in which this definition does not fit the merchandise at bar, notably as to use.* The possibility that exhibits 1 and 2 are not combs in the tariff sense is one we cannot eliminate entirely, without testimony and without briefing. * * * [Emphasis added.]

of headnote 2, *supra*, and that they were erroneously classified under item 750.15.

The "hand tools" provision of item 651.49 is with certain exceptions not pertinent hereto, limited by virtue of the headnote to Schedule 6, Part 3, Subpart E to—

> * * * articles with a blade, working edge, working surface or other working part of—
>
> (i) base metal;
>
> * * * * * * *

Hand tools have been held to include any tool which is held and operated by the unaided hands. *Hollywood Accessories, Division of Allen Electronics & Equip. Co.* v. *United States*, 60 Cust. Ct. 360, C.D. 3391, 282 F. Supp. 499 (1968) ; *P. H. De Wilde* and *Harper, Robinson & Co.* v. *United States*, 35 Cust. Ct. 295, Abstract 59420 (1955).

Although the articles at bar have a working edge or working surface of base metal and come within the aforequoted definition, defendant contends that they are not hand tools within the common meaning of that term. However, we note that the *Summaries of Trade and Tariff Information, Schedule 6*, Volume 6 (1968), a Tariff Commission publication cited by defendant as enumerating articles "which are in the nature of tools" states (pages 147–148) :

> The major group of tools covered by this summary consists of a large variety of hand tools made of iron or steel and not enumerated elsewhere (item 651.47). This item is divided into two statistical subdivisions. The first of these, item 651.4720, covers table, kitchen and household implements of the character of hand tools. Among the tools included in this category are bottle, can, and letter openers; fruit and vegetable corers; melon and potato ballers; corkscrews and cork pullers; fruit, vegetable, egg, and cheese slicers, graters, and cutters; mashers, spatulas, beaters, sifters, turners, tongs, ice cream scoops, and strainers; and fireplace tools, *hair curling tools*, sadirons, shoe horns, and staple removers. * * * [Emphasis added.]
>
> * * * * * * *
>
> Except for the materials of which they are made, the tools provided for under items 651.49, 651.51, 651.53, and 651.55 are essentially of the same types as those classified under item 651.47. Most of them are table, kitchen, or household implements. Tools in chief value of brass, copper, or aluminum are separately provided for; * * *.

Far from being limited in character, the conglomerate assortment of tools named in the Summaries reveals a range of articles broad enough to include the straightening combs. This is particularly indicated by the naming of hair curling tools. If curling irons (which, as noted in the incorporated case are used in much the same manner as straightening combs) are hand tools, the articles at bar are not less

hand tools. Of course, we recognize that studies made after enactment of a statute are not controlling in determining the legislative intent; nevertheless, a survey prepared by the same commission which drafted the legislation carries some weight in the absence of any shown contrary intent. *Border Brokerage Company, Inc.* v. *United States*, 64 Cust. Ct. 331 C.D. 3999 (1970).

In order to bring the merchandise within the superior heading, "household implements of the character of hand tools", it was incumbent upon plaintiff to show that this class or kind of straightening comb is chiefly used in the household at, or immediately prior to, the date of importation. General Interpretative Rule 10(e)(i).[5]

Although conceding differences in construction between "home" and "professional" straightening combs, defendant contends, as it did in the incorporated case, that "all such straightening combs are of the same class or kind" for purposes of establishing chief use pursuant to Rule 10(e)(i). However, we agree with Judge Nichols that the combs at bar, which are constructed differently from, are less durable and can break the hair more easily than, professional straightening combs, are not of the same class or kind as the latter.

With respect to chief use, the court has stated, in *Al Nyman & Son, Inc.* v. *United States*, 61 Cust. Ct. 236, 240–241, C.D. 3585 (1968)—

> It is well settled that chief use is a question of actual fact which must be established on the basis of positive testimony representative of an adequate geographical cross section of the country (*L. Tobert Co., Inc., et al.* v. *United States*, 41 CCPA 161, C.A.D. 544) and that while the testimony of a single witness may be sufficient, such witness must be well qualified and his testimony must be of a convincing character and not negatived or controverted by substantial testimony to the contrary. (*United States* v. *Gardel Industries*, 33 CCPA 118, C.A.D. 325; *United States* v. *S. S. Perry*, 25 CCPA 282, T.D. 49395). Furthermore, it is proper to consider not only the testimony, but the characteristics of the merchandise itself. *United States* v. *Colibri Lighters* (*U.S.A.*) *Inc.*, 47 CCPA 106, C.A.D. 739. Executives concerned with designing, framing specifications, ordering, importing, selling, distributing, and promoting an article have to know its chief uses and have been held competent to testify about them. *F. B. Vandegrift & Co., Inc.* v. *United States*, 56 Cust. Ct. 103, C.D. 2617; *Royal Cathay Trading Co. et al.* v. *United States*, 56 Cust. Ct. 371, 383, C.D. 2662; *Fred Bronner Corp.* v. *United States*, 57 Cust. Ct. 428. 438–439, C.D. 2832; *Inter Maritime Fwdg. Co., Inc.* v. *United*

---

[5] This rule provides that—

 (e) in the absence of special language or context which otherwise requires—

 (i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined;

*States*, 59 Cust. Ct. 412, C.D. 3177 (appeal dismissed, May 6, 1968).

The evidence in the instant case indicates that the pin curl clips involved herein are used both at home and in beauty shops for setting women's hair. They are bought by women in retail stores packaged 8 to a card and are sold to beauty shops in boxes containing 100. *Contrary to the hair straightening combs and the curling irons involved in F. B. Vandegrift & Co., Inc. v. United States, supra, there is nothing about these clips making them suitable for use only in the home.* * * * [Emphasis added.]

In disputing plaintiff's claim to have established chief use of the merchandise as household articles, the government argues that "Straightening combs are now used by both Negro and white women; there is no testimony that white women use the combs in their homes" (brief, page 26). However, it was Gayer's uncontroverted testimony that "When it's used [by white women] it's used in the same manner" (R. 19). Be that as it may, we find no support for, and reject as totally groundless, an argument posited on the assumption that use of these combs by white women imports a different manner or place of use from that of black women which must somehow be disproved by plaintiff (apparently by showing that white women also use the combs in their homes).

We are satisfied, on the entire record herein, that the non-professional type combs at bar are chiefly used in the household by its members. As the articles were stipulated to be in chief value of brass, they come within the ambit of item 651.49, as claimed.

In view of our finding, we need not consider plaintiff's alternative claim under the general "basket" provision of item 654.00 for brass articles not specially provided for, "of a type used for household * * * use."

The protest claim under item 651.49 is sustained; the claim under item 654.00 is overruled.

Judgment will be entered accordingly.